UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| MOZZY CLARK,<br><br>Plaintiff,<br><br>v.<br><br>DENNIS SIMONS, et al.,<br><br>Defendants. | Case No. 3:24-cv-06058-TMC<br><br>ORDER ON SUMMARY JUDGMENT MOTIONS |

## I. INTRODUCTION

Plaintiff Mozzy Clark alleges that she was sexually assaulted by her cellmate while incarcerated at the Washington Corrections Center for Women ("WCCW"), and that defendant officers of the Washington Department of Corrections failed to protect Ms. Clark and refused to address complaints about her cellmate. Dkt. 68 ¶¶ 1–7.

Defendants have filed three separate summary judgment motions, each seeking to dismiss Clark's claims against them in their entirety. Dkts. 82, 87, 91. For the reasons stated below, the Court GRANTS IN PART and DENIES IN PART the motions filed by Defendants Edwin Schulze, Dennis Simons, and Carie Ann Williams (Dkt. 82) and Gregory Brooks (Dkt. 91). The Court GRANTS the motion filed by Theresa Ayotte. Dkt. 87. All claims are DISMISSED WITH

PREJUDICE except for Clark's Eighth Amendment claims against Defendants Williams and Brooks.

## II. BACKGROUND

The following facts are either not genuinely disputed in the summary judgment record or taken in the light most favorable to Clark, the non-moving party.

In early 2022, Clark was incarcerated at the WCCW in Gig Harbor, Washington. Dkt. 84 ¶¶ 3–4. While there, Clark shared a cell with a transgender inmate, Christy Williams ("Williams," or "Inmate Williams")[1] for a total of ten days between February 10, 2022, and February 20, 2022. *Id.* ¶¶ 3–5; Dkt. 107-5 at 10–11. Beginning about one day after being housed together, and throughout the ten days they shared a cell, Inmate Williams sexually harassed Clark in several ways:

- Inmate Williams would rub her penis through her clothes in front of Clark while sitting or standing close to Clark's bunk and making sexualized comments—such as that Williams "hates when" her penis "fills up with blood" and that she didn't understand "why [Clark doesn't] want it when other girls are willing to pay for it." Dkt. 83-1 at 16–17, 23.
- Inmate Williams would follow Clark to the bathroom and look over the shower doors at Clark while she showered, once telling Clark, "I just want you to know I can get you whenever I want." *Id.* at 19–22, 24.

---

[1] The complaint refers to Inmate Williams as "a fully intact biological male," Dkt. 68 ¶ 26, while Defendants refer to Williams as a "transgender female inmate." Dkt. 82 at 2. Consistent with Williams's stated identity and the Court's practice of treating all parties and witnesses with respect, *see* Dkt. 68 ¶ 29, this Court will refer to Williams using she and her pronouns, except when quoting an exhibit or the testimony of a witness. As discussed during oral argument on Defendants' summary judgment motions, *see* Dkt. 118, while facts pertaining to Williams's criminal history and conduct while incarcerated are certainly relevant, neither her gender identity alone nor the Court's use of her preferred pronouns is material to Clark's legal claims.

- Inmate Williams once showed Clark homemade sex toys and "asked [Clark] to use them on [Williams]." *Id*. at 27.
- Overnight, Clark would wake up to find Inmate Williams "sitting on the floor next to [Clark] in the complete dark, nothing on." *Id*. at 25.

Clark testified in her deposition that the harassment was "constant." *Id*. at 19. Inmate Williams repeated similar conduct and made similar comments multiple times. *Id*. at 21–24.

One night, Clark awoke to find Inmate Williams touching her, with Williams sitting on the floor next to her bunk and Williams's hand down Clark's pants. *Id*. at 25–26, 32. Clark was "frozen with fear and thought [Inmate Williams] was going to rape [her]." Dkt. 102 ¶ 8. Clark testified that she woke up because Defendant Ayotte had passed by their cell, seen Williams on the floor, and said, "What are you doing? Why are you down there? Get back up on your bed." Dkt. 83-1 at 25–26. After Williams went back to her own bed, Clark found that her shirt had been pulled up to reveal her sports bra. *Id*. at 34. Clark testified that she had found her shirt pulled up on previous nights but disregarded that fact as incidental at the time. *Id*. at 25. Since the assault, Clark has "experienced almost daily nightmares" and "severe stress, anxiety, and fear on a daily basis." Dkt. 102 ¶ 9.

On February 20, 2022, Clark made a formal Prison Rape Elimination Act ("PREA") complaint about Inmate Williams's conduct to WCCW officers. Dkt. 83-1 at 15; Dkt. 107-9 at 3–12. Inmate Williams was transferred to a different cell that same day, after WCCW received Clark's PREA complaint. Dkt. 84 ¶ 4; *see* Dkt. 84-2 at 5 (inmate transfer records indicating that Williams was transferred to a different bed because she "pose[d] a threat to the orderly running of the facility"). Defendant Simons interviewed Clark about the above events on March 26, 2022. Dkt. 83-1 at 35–40. The investigation identified two of Clark's allegations: first, that Inmate Williams had shown Clark her sex toys and made threats of retaliation if a PREA

complaint was filed against Williams regarding the sex toys; and second, that Williams would follow Clark to the bathroom and look over the stall at Clark while Clark showered. Dkt. 107-9 at 7. The investigation found the first allegation substantiated by evidence and the second allegation unsubstantiated. *Id*.

Clark initially brought this case on December 27, 2024, Dkt. 1, and later amended her complaint on January 8, 2025, February 20, 2025, and May 4, 2026. Dkts. 8, 32, 68. Clark claims (1) that her sexual assault was caused by Defendants' deliberate indifference to her risk of serious harm from Williams, in violation of the Eighth Amendment; (2) that Defendants violated Clark's right to bodily privacy by allowing Williams to follow her into the showers, in violation of the Fourteenth Amendment; and (3) that Defendants engaged in a conspiracy to violate Clark's constitutional rights. *See* Dkt. 68 ¶¶ 60–79.

Clark's claims vary as to each individual Defendant and their involvement in the alleged constitutional violations. Defendants have filed three separate motions for summary judgment. Dkts. 82, 87, 91. Accordingly, the Court discusses the relevant facts for each of the three groups of Defendants below.

**A. Defendants Schulze, Simons, Williams**

Defendant Schulze was the correctional unit supervisor ("CUS") responsible for Clark's unit. Dkt. 107-5 at 11. Schulze was involved in the decision to transfer Inmate Williams to Clark's cell on February 10, 2022. *Id.*; Dkt. 84 ¶¶ 4–5; Dkt. 84-3. DOC records contain no documentation of a required PREA compatibility screening before Schulze approved the cell move, *see* Dkt. 83-4 at 11, and a reasonable jury could infer that Schulze failed to conduct it. While Clark was housed with Williams, she complained to Schulze that she "was uncomfortable with Inmate Williams and that [she] did not want to go into details because [she] was afraid" and "cr[ied] to CUS Schulze because [she] did not want to go back to [her] room with Williams."

Dkt. 102 ¶ 7. When interviewed during the investigation of Clark's PREA complaint, Schulze stated that Plaintiff "did come to [him] and stated she had an issue" but did not give specifics or "elaborate on any details." Dkt. 107-9 at 18.

Defendant Simons is a Lieutenant at WCCW who conducted the PREA investigation and who interviewed Clark and the other Defendants in this case for that purpose. Dkt. 86 ¶¶ 2–3, 5–7. Clark testified that Simons's notes from his interview with Clark were incomplete. *See* Dkt. 107-4 at 21 ("[T]here should be more to the statement. . . . [I] told him about [Inmate Williams] sitting next to my bed, I told him about my shirt being pulled up, I told him about the time when he was pulling his hands out of my pants. . . . And Ayotte knocking on the door and telling him to get back in his bed."). Clark admitted that she initialed the notes from her interview but testified that she did not actually read them because she "was pretty upset . . . when [she] was doing it." *Id*. at 18.

Defendant Williams was the unit's Sergeant. Dkt. 107-5 at 11. When Clark asked Defendant Brooks to move her to another cell prior to her sexual assault (discussed further below, *see infra* Section II.C), Brooks told Clark that he had spoken with Defendant Williams and "that she said . . . they wouldn't move because of the COVID thing and then that they were worried about some kind of retaliation." Dkt. 107-4 at 14–15. Clark also spoke with Williams herself. *See Id*. at 20 ("I had talked to Williams at one point and was asking her to move [Inmate Williams] because I felt uncomfortable, and she said that she can't, that she just couldn't do it, and she—I can't remember if she was the one that told me or Brooks told me that they—they were worried about retaliation, but I didn't know what that meant."). Clark had told Defendant Williams that Inmate Williams had made sexual comments and followed Clark into the bathroom. *Id*. Clark also asked Defendant Williams—along with Ayotte and Brooks—to watch and observe Inmate Williams following Clark into the bathroom. *Id*.; Dkt. 107-9 at 11.

According to Clark's testimony and her report to Defendant Simons, Defendant Williams told Clark to "get over it and deal with the stuff going on in and out of the cell." *Id*. Defendant Williams stated during the PREA investigation that Clark did not approach Williams to complain, and that Williams was only aware that Clark had complained to Brooks. *Id*. at 16. After Clark reported Inmate Williams's sex toys, Defendant Williams helped search the cell and confiscate the objects. *See id*. When Defendant Williams asked Inmate Williams about one of the sex toys, Inmate Williams admitted that the object was hers and but that "she had not been using [it] in any fashion on herself or anyone else." *Id*.

**B. Defendant Ayotte**

Defendant Ayotte was a corrections and custody officer at WCCW who oversaw Clark and Inmate Williams. Dkt. 88 ¶¶ 2–3. Clark testified in her deposition that Ayotte passed by their cell while Inmate Williams was sexually assaulting Clark and told Williams to "[g]et back up on your bed." Dkt. 107-4 at 13. Clark concedes that she "does not contend that Ayotte necessarily saw Williams's hand inside Clark's clothing." Dkt. 104 at 15; *see* Dkt. 107-4 at 12–13. Ayotte avers that she does "not have a specific recollection of knocking on Clark's cell door and telling Williams to return to her bunk," but that she can "say with certainty that [she] never observed Williams fondling Clark or touching her." Dkt. 88 ¶ 8. Before the assault and after an incident where Inmate Williams had followed Clark into the bathroom, Clark told Ayotte to "[w]atch her . . . she's following me everywhere and into the bathroom." Dkt. 107-4 at 20. Ayotte told Clark, "Okay, I'll keep an eye on it." *Id*.

**C. Defendant Brooks**

Defendant Brooks is a corrections and custody officer at WCCW who oversaw Clark during her work in the facility's kitchen. Dkt. 92 ¶¶ 2–3. Clark testified that Brooks was the first WCCW officer she told about Inmate Williams's conduct. Dkt. 107-4 at 14. During this first

conversation, Clark told Brooks that Inmate Williams was "rubbing hisself [sic]" and talking about her erect penis to Clark. *Id*. She "asked him to help get [Clark] moved" and "told him [she] didn't feel comfortable," and that "the stuff that [Inmate Williams] was saying was inappropriate." *Id*. In response, Brooks "kind of laughed about it" and said "that he would talk to [Defendant] Williams . . . because she was the sergeant." *Id*. Brooks also "went on the computer and looked up what [Inmate Williams] was there for." Dkt. 107-8 at 5.

Although Clark's testimony is vague about what records Brooks looked up, a PREA risk assessment noted that Inmate Williams was convicted of "Assault 3 w/ Sexual Motivation" for her sexual assault on a 10-year-old in a crisis home when she was 14 years old. Dkt. 107-1 at 46. The document continues:

> No previous Sexual Assault in confinement noted, however has been caught staring at female staff, masturbating in front of staff, and exposing buttocks to staff. Offender has several convictions for Failure to Register as a Sex Offender. . . . Offender has convictions for DV-related Assault 1st with Deadly Weapon and Harassment (current offense—victim was offender's girlfriend.

*Id*. Based on her previous crimes, the PREA risk assessment noted that Inmate Williams could be a "Potential Predator," particularly in a women's facility. *Id*. at 19, 46.

Clark spoke with Brooks again the next day and told him that Inmate Williams had followed her into the bathroom and "made that comment about, 'I don't know why you don't want it when all the other girls are willing to pay for it.'" Dkt. 107-4 at 14. Brooks responded, "Yeah, I heard the going rate is a bag of chips." *Id*.

Clark testified that she spoke to Brooks at least once or twice more about Inmate Williams. *Id*. at 14–15. Clark told Brooks about Inmate Williams sitting on the floor near Clark's bunk while Clark slept, "and at one point Brooks even came to the unit after his shift and walked to [Clark's] door" and saw Inmate Williams sitting on the floor "right next to [Clark's] bed"—such that Clark could not "even get out of [her] bed to get to the door." *Id*. at 15. Clark told

Brooks about Inmate Williams's sex toys, prompting a search of the cell and officers confiscating the items. *Id*. Clark testified that she believes she told Brooks not to tell Inmate Williams that she had reported the sex toys. *Id*.

## III. JURISDICTION

The Court has federal question jurisdiction over this matter because Clark's complaint contains claims that "aris[e] under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331; *see* Dkt. 68 ¶¶ 55–79 (alleging claims under the First, Eighth, and Fourteenth Amendments).

## IV. LEGAL STANDARDS

### A. Summary judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party has the initial burden of "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, the non-moving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Zellmer v. Meta Platforms, Inc.*, 104 F.4th 1117, 1122 (9th Cir. 2024) (quoting *Anderson*, 477 U.S. at 256).

The evidence relied upon by either party must be able to be "presented in a form that would be admissible in evidence." *See* Fed. R. Civ. P. 56(c)(2). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be

admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony.").

Conclusory, nonspecific statements in affidavits are not sufficient, and "missing facts" will not be "presume[d]." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). However, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam) (alteration in original) (quoting *Anderson*, 477 U.S. at 255). Consequently, "a District Court must resolve any factual issues of controversy in favor of the non-moving party only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied." *Lujan,* 497 U.S. at 888 (internal quotations omitted).

**B. Qualified immunity**

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Courts follow a "two-step sequence" to analyze qualified immunity defenses:

> First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.

*Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (internal citations omitted). Which step to analyze first is an exercise of discretion "in light of the circumstances in the particular case at hand." *Id.* at 236.

## V. DISCUSSION

### A. Eighth Amendment claims

The Eighth Amendment imposes a duty upon prison officials to "provide humane conditions of confinement." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). This duty includes "ensur[ing] that inmates receive adequate food, clothing, shelter, and medical care," and "tak[ing] reasonable measures to guarantee the safety of the inmates." *Id*. (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). In a case alleging a constitutional violation based on a failure to prevent harm, the plaintiff must first meet an objective component by showing that "[s]he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* at 834.

A plaintiff must also meet a subjective component by showing the prison official acted with "'deliberate indifference' to inmate health or safety." *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 302 (1991)); *Helling v. McKinney*, 509 U.S. 25, 32 (1993) ("[A] claim that the conditions of a prisoner's confinement violate[s] the Eighth Amendment requires an inquiry into the prison officials' state of mind."). "[A] prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. A prison official's "failure to alleviate a significant risk that he should have perceived but did not," therefore, cannot "be condemned as the infliction of punishment." *Id.* at 838.

Clark claims that each Defendant failed to protect her from sexual assault by Inmate Williams. The Court finds that this claim survives summary judgment against Defendants Williams and Brooks, but not against any of the other Defendants.

*1. Defendants Williams and Brooks*

Clark's Eighth Amendment claim survives summary judgment against Defendants Williams and Brooks because there is a material dispute of fact regarding their knowledge of a risk of sexual assault to Clark by Inmate Williams and whether they acted with deliberate indifference when they declined to rehouse one of them into a separate cell.

First, Defendant Williams (1) was asked by Clark to move Inmate Williams to a different cell because Clark "felt uncomfortable," Dkt. 107-4 at 20; (2) was told by Clark[2] that Inmate Williams had made sexual comments towards her and followed her into the bathroom, *id.*; Dkt. 107-9 at 11; (3) spoke with Brooks about moving Inmate Williams and told Clark that Williams would not be moved, Dkt. 107-4 at 20; (4) told Clark to "get over it and deal with the stuff going on in and out of the cell," *id.*; (5) confiscated sex toys from Inmate Williams after Clark reported the items to Brooks and expressed fear that Inmate Williams might retaliate against Clark for reporting her, *id.* at 15; Dkt. 107-9 at 16; and (6) spoke to Brooks after he "went on the computer and looked up" Inmate Williams's criminal history, which included assault convictions and may have included information about her previous harassment while in prison. Dkt. 107-8 at 5; *see* Dkt. 107-1 at 46.

Second, and similarly, Brooks (1) was asked by Clark multiple times if Clark could be moved to a different cell because she was uncomfortable, Dkt. 107-4 at 14–15; (2) was told by Clark about Williams's sexual comments and gestures directed at Clark and about Williams

[2] Although Defendant Williams has stated that Clark did not approach her to complain about Inmate Williams, Dkt. 107-9 at 16, this is a factual dispute for a jury to resolve.

following Clark into the bathroom, *id*.; (3) rejected Clark's request to separate her from Williams, *id*. at 20; (4) joked about "the going rate [being] a bag of chips" for sex with Williams in response to Clark's complaints, Dkt. 107-8 at 7; (5) received Clark's report about Williams's sex toys, Dkt. 107-4 at 15; and (6) reviewed Williams's criminal history. Dkt. 107-8 at 5.

The inaction of Defendants Williams and Brooks, combined with their dismissive comments and knowledge of Inmate Williams's behavior, is sufficient for a reasonable jury to find that they acted with deliberate indifference to Clark's health and safety. Where a prison official knows of a substantial risk of serious harm to one inmate from another—whether via threats from the latter or complaints from the former—and disregards that risk, that official violates the Eighth Amendment. *See Farmer*, 511 U.S. at 837; *Wilk v. Neven*, 956 F.3d 1143, 1148–50 (9th Cir. 2020) (holding that prison officials violated the Eighth Amendment where one inmate threatened to kill another, prison officials knew this but placed them in separate units that "sometimes interacted," then the inmate attacked).

As Clark correctly argues, *Farmer* does not "require Clark to prove that" Defendants Williams or Brooks "knew exactly how or when Inmate Williams would assault her." Dkt. 105 at 16; *see Jeremiah v. Jantzen*, No. 2:21-CV-00618-MK, 2023 WL 1470392, at *7 (D. Or. Feb. 2, 2023) ("The deliberate indifference standard 'does not require that the guard or official believe to a moral certainty that one [inmate] intends to attack another at a given place at a time certain before that officer is obligated to take steps to prevent such an assault.'" (quoting *Leonard v. Peters*, No. 21-35471, 2023 WL 387035, at *2 (9th Cir. Jan. 10, 2023))). And while it is true that Inmate Williams never expressly threatened to sexually assault Clark, a significant risk of harm can be established by an "inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. Here, a reasonable jury could conclude that Defendants Williams and Brooks were aware of

aggressive and sexually explicit comments, behaviors, and gestures that showed Clark was in danger of being sexually assaulted.

To prevail on her Eighth Amendment claim, Clark "must also show that [Defendants Williams and Brooks] are not entitled to qualified immunity by demonstrating that the right to be free from violence from other inmates was 'clearly established' at the time of the incident." *Leonard*, 2023 WL 387035, at *3. Here, neither Defendant "can claim ignorance to a prisoner's right to be protected from violence at the hands of other inmates." *Wilk*, 956 F.3d at 1150 (citing *Farmer*, 511 U.S. at 833). And it is also clearly established that, if Williams and Brooks knew of the threat to Clark, they were required to "'take reasonable measures to mitigate the [known] substantial risk[s]' to a prisoner." *Id*. (alterations in original) (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1067 (9th Cir. 2016)). The evidence of subjective knowledge by Defendants Williams and Brooks is similar enough to *Wilk* and the cases cited therein that any "reasonable prison official in the defendants' position would know that the actions defendants took, and failed to take," could violate the Eighth Amendment. *Id.*; *see also id.* at 148 ("The Supreme Court need not catalogue every way in which one inmate can harm another for us to conclude that a reasonable official would understand that his actions violated the Eighth Amendment." (alteration omitted) (quoting *Castro*, 833 F.3d at 1067)). Because this law was clearly established at the time of their misconduct, Defendants Williams and Brooks are not entitled to qualified immunity. *Pearson*, 555 U.S. at 232.

Considering all facts in the light most favorable to Clark, a material factual dispute exists as to whether Defendants Williams and Brooks knew of a substantial risk of harm to Clark and, in failing to house her and Inmate Williams in separate cells, acted with deliberate indifference of that risk in violation of the Eighth Amendment. Moreover, qualified immunity does not protect Defendant Williams or Brooks. The Court therefore DENIES the motions for summary

judgment (Dkts. 82, 91) with respect to Clark's Eighth Amendment Claims against Williams and Brooks.

2. *Remaining Defendants*

In contrast to Defendants Williams and Brooks, each remaining Defendant was either unaware of a risk of substantial harm to Clark or took reasonable measures to mitigate the known risk.

First, Schulze was responsible for initially transferring Inmate Williams to Clark's cell and had one conversation about Williams's behavior with Clark. Dkt. 84 ¶¶ 4–5; Dkt. 102 ¶ 7. While Clark's complaint suggests that the mere act of housing a transgender woman with a cisgender woman in a women's prison constitutes deliberate indifference to the latter's safety, *see* Dkt. 68 ¶¶ 2–3, this assertion is not supported by the summary judgment record, and Clark seems to have largely abandoned it. Clark has not shown that Inmate Williams's gender alone created a substantial risk of harm, and "[t]he Eighth Amendment does not impose any such blanket requirement, because a prisoner does not have a constitutional right to a particular prison placement." *Gordon v. Inslee*, No. 3:21-CV-5802-BJR-DWC, 2023 WL 2874062, at *11 (W.D. Wash. Feb. 6, 2023), *report and recommendation adopted*, No. 21-5802-BJR-DWC, 2023 WL 2864187 (W.D. Wash. Apr. 10, 2023).

Equally unsupported is Clark's assertion that Schulze's failure to conduct a PREA compatibility screening is a per se Eighth Amendment violation or that Clark would not have been harmed if Schulze had conducted the screening. Dkt. 106 at 15–16; *Cox v. Nobles*, No. CV 119-031, 2020 WL 1541698, at *6 (S.D. Ga. Mar. 31, 2020) (concluding that noncompliance with PREA is not a per se Eighth Amendment violation), *aff'd*, 15 F.4th 1350 (11th Cir. 2021); *see* Dkt. 84 ¶ 8 ("[O]n February 10, 2022, Ms. Clark and Inmate Williams had compatible [PREA risk assessment] identifiers such that placing them into the same cell that day was

permissible.”). Additionally, Clark’s statements to Schulze during their conversation were vague and, considered in the light most favorable to Clark, did not convey to Schulze that Clark faced a substantial risk of sexual assault. Dkt. 102 ¶ 7; Dkt. 107-9 at 18.

Second, Simons directed the PREA investigation and only interacted with Clark after the sexual assault had occurred. Dkt. 86 ¶¶ 2–3. Clark asserts that Simons left important facts out of his investigation notes. Dkt. 107-4 at 21; Dkt. 106 at 12. But while a jury may find Simons less persuasive because of this, Clark does not explain how it rises to the level of a constitutional claim. *See* Dkt. 106 at 12. After being removed from Clark’s cell, Inmate Williams was never re-housed in the same cell or tier as Clark. Although Clark states that Inmate Williams harassed her during later interactions between the two in common areas of the prison, *see id.* at 12–13, she has not shown how any liability could lie with Simons for these events.

Third, Ayotte knew that Clark was being followed by Inmate Williams into the bathroom and, later, passed by Clark’s cell while she was being sexually assaulted by Inmate Williams. Dkt. 107-4 at 13, 20. Clark’s own testimony shows that Ayotte’s responses to both events were reasonable and defeats Clark’s argument that Ayotte acted with deliberate indifference. In response to Clark telling her to watch for Inmate Williams following her into the bathroom, Ayotte told Clark that she would “keep an eye on it.” *Id*. at 20. And, viewed in a light most favorable to Clark, the facts do not show that Ayotte was aware Clark was being sexually assaulted by Inmate Williams when Ayotte passed by their cell and asked Williams what she was doing and why she was sitting on the ground. Dkt. 107-4 at 13; *see* Dkt. 88 ¶ 8 (Ayotte’s declaration that she can “say with certainty that [she] never observed Williams fondling Clark or touching her”); Dkt. 104 at 15 (“[Clark] does not contend that Ayotte necessarily saw Williams’s hand inside Clark’s clothing.”). It is undisputed that Ayotte immediately pounded on the door and ordered Williams back to her own bed, waking Clark and ending the assault.

Because the record demonstrates that Schulze, Simons, and Ayotte did not act with deliberate indifference and that no reasonable jury could find that they violated the Eighth Amendment, the Court GRANTS the motions for summary judgment with respect to these Defendants.

**B. Fourteenth Amendment and conspiracy claims**

In addition to her Eighth Amendment claims, Clark claims that Defendants (1) violated Clark's right to bodily privacy under the Fourteenth Amendment by allowing Williams to follow her into the showers and (2) conspired to deprive her of her constitutional rights by housing transgender women in a women's prison and suppressing other inmates' complaints "so those placements would not be disturbed." Dkt. 106 at 24; Dkt. 68 ¶¶ 65–79.

First, "incarcerated prisoners retain a limited right to bodily privacy." *Michenfelder v. Sumner*, 860 F.2d 328, 333 (9th Cir. 1988). Under a Fourteenth Amendment claim like the one here, the Court must consider whether WCCW's policy of allowing inmates to shower together is "reasonably related to legitimate penological interests." *Byrd v. Maricopa Cnty. Bd. of Supervisors*, 845 F.3d 919, 923 (9th Cir. 2017) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

But Clark has not argued this point and instead focuses on whether Defendants are liable under the Fourteenth Amendment for allowing Williams to follow her into the bathroom. *See, e.g.*, Dkt. 105 at 20 ("Clark does not claim that Brooks wrote DOC's transgender housing policy or selected Inmate Williams as her cellmate. Her claim is that after Brooks learned Williams was following her into bathrooms and showers, peering over the chest-high partitions, and making sexual comments in those spaces, Brooks failed to take the steps required of him to stop a continuing invasion."). The Court agrees with Defendants that such claims are addressed under the Eighth Amendment's failure-to-protect framework discussed above. Dkt. 112 at 10 (citing

*Ohlson v. Washington*, No. 3:22-CV-5864-JCC-DWC, 2024 WL 4109080, at *13–14 (W.D. Wash. May 24, 2024) (analyzing a plaintiff's "prolonged nudity" claim under the Eighth Amendment), *report and recommendation adopted*, No. C22-5864-JCC, 2024 WL 3755862 (W.D. Wash. Aug. 12, 2024), *appeal dismissed*, No. 24-5561, 2025 WL 2639892 (9th Cir. Apr. 4, 2025)). Clark's evidence about Inmate Williams's conduct in the bathrooms may be part of her remaining Eighth Amendment claims against Defendants Williams and Brooks, but she has not made out a separate Eighth Amendment claim that the Defendants were deliberately indifferent to a substantial risk of serious harm from this conduct alone. *See Farmer*, 511 U.S. at 837. Clark's privacy claim must therefore be dismissed.

Second, Clark has not shown any evidence from which a jury could find "an agreement or 'meeting of the minds' to violate constitutional rights," a requirement for a conspiracy claim under 42 U.S.C. § 1983. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540–41 (9th Cir. 1989) (en banc) (quoting *Fonda v. Gray*, 707 F.2d 435, 438 (9th Cir. 1983)). Viewed in the light most favorable to Clark, the record does not show that any two Defendants agreed "to refuse meaningful protection, minimize sexual-misconduct complaints, and avoid the formal response those complaints required." Dkt. 105 at 23–24. Defendants Williams and Brooks, for example, decided not to move Inmate Williams from Clark's cell. Dkt. 107-4 at 14, 20. But Clark provides no evidence that this decision was "unlikely to have been undertaken without an agreement" between Defendants Williams and Brooks. *Crowe v. County of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010) (quoting *Mendocino Env't Ctr. v. Mendocino County*, 192 F.3d 1283, 1301 (9th Cir. 1999)). Nor does Clark present any evidence that the two shared a common objective to violate Clark's Eighth Amendment rights. *See id*. at 440–41 ("A 'common objective' to merely prosecute the boys is insufficient; fair prosecution would not violate the boys' constitutional rights. It is too great a leap to conclude that help in obtaining a confession—

even a coerced confession—suggests that McDonough shared the common objective of falsely prosecuting the boys.”).

## VI. CONCLUSION

The Court GRANTS IN PART and DENIES IN PART the motions filed by Defendants Edwin Schulze, Dennis Simons, and Carie Ann Williams (Dkt. 82) and Gregory Brooks (Dkt. 91). The Court GRANTS the motion filed by Theresa Ayotte. Dkt. 87. All claims are DISMISSED WITH PREJUDICE except for Clark’s Eighth Amendment claims against Defendants Williams and Brooks.

Dated this 16th day of September, 2026.

Tiffany M. Cartwright
United States District Judge